UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>　-against-<br><br>IGNITE INTERNATIONAL BRANDS, LTD., PAUL BILZERIAN, PAUL DOWDALL, SCOTT ROHLEDER, JOHN SCHAEFER, INTERNATIONAL INVESTMENTS, LTD., ACCELL AUDIT & COMPLIANCE, PA, AND CHRISTOPHER HIESTAND,<br><br>　　　　　Defendants. | <u>COMPLAINT</u><br><br>Case No. 1:24-cv-07331<br><br><br>JURY TRIAL DEMANDED |

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against Defendants Ignite International Brands, Ltd. ("Ignite"), Paul Bilzerian ("Bilzerian"), Paul Dowdall ("Dowdall"), Scott Rohleder ("Rohleder"), John Schaefer ("Schaefer"), International Investments, Ltd. ("International Investments"), Accell Audit & Compliance, PA ("Accell"), and Christopher Hiestand ("Hiestand") (collectively, "Defendants") alleges:

## SUMMARY

1.　　From late 2020 to 2021, Ignite—a Canadian company that sells disposable vape pens and other nicotine e-liquid products and whose shares traded in the United States—engaged in a scheme, orchestrated largely by recidivist Bilzerian, who controls Ignite, to fraudulently report revenue. In January 2021, the company reported revenue of about CAD $10.1 million (USD $7.9 million) for the fourth quarter of 2020, which, as Ignite noted in a January 19, 2021 press release, "exceeded revenue for the previous three quarters combined." Following the press

release, Ignite's share price in the United States, as quoted on OTC Link, rose by more than 144%.

2.      Most of the purported fourth-quarter revenue, however, existed only as three fraudulent invoices for disposable vape pens that Ignite had issued to one of its customers, Company 1. Company 1 had not ordered that product, never took possession of it, and its president, Individual 1, repeatedly disputed the invoices with Schaefer, Ignite's then-President and COO, and Bilzerian. Ignite issued its press release touting the fake revenue anyway.

3.      By late January 2021, Accell's audit of Ignite's 2020 financial statements was underway. When Accell sought to confirm the accounts receivable tied to the fraudulent invoices with Company 1, Individual 1 refused to confirm that Company 1 owed the amounts stated. Unable to persuade Individual 1 to confirm the amounts reflected in the invoices, Bilzerian changed course and directed International Investments, which he also controls, to nominally "purchase" the inventory listed in the invoices in exchange for a reduction in debt Ignite owed International Investments. In late February, Ignite credited Company 1 for USD $4.6 million (CAD $5.9 million), backdating the credit notes to December 31, 2020. Ignite also issued invoices in the same amounts to International Investments, also backdating the invoices to December 31, 2020. Ignite did not, however, restate its 2020 financial statements or correct its January 2021 press release.

4.      Dowdall, who was Ignite's Chief Financial Officer ("CFO"), Rohleder, who was International Investments' CFO, and Schaefer each worked to further the scheme. Dowdall worked out the changes to reconcile Ignite's books to the fraudulent invoices issued to Company 1 and the new, backdated invoices to International Investments. He also worked with Rohleder to provide a false explanation for the transactions to Accell and Hiestand so that the fraudulent

revenue could be reported in 2020. Schaefer, who had no position at International Investments, tracked the product purportedly sold to International Investments as the product was stored and purchased by another Ignite customer. Schaefer personally handled invoicing for International Investments—directing payment to an entity controlled by Rohleder because International Investments could not lawfully sell the product to the Ignite customer.

5.      Hiestand, who was Accell's engagement partner responsible for the Ignite audit, knew that Company 1 did not confirm the accounts receivable tied to the fraudulent invoices, but made no inquiry with Company 1 to confirm Ignite's and International Investments' story. Instead, he went along with the false story he had been told by Dowdall and Rohleder and assisted Ignite's fraud even though other information Hiestand had received about the invoices contradicted the story. Hiestand was at least reckless in not knowing that the "sale" to International Investments occurred in 2021 and there was no basis for recognizing the revenue in 2020. Yet, in April 2021, Hiestand requested and accepted for inclusion in the Ignite audit file documentation that would reflect a purchase by International Investments from Ignite in December 2020. And when a specialist in Canadian accounting and auditing standards that Accell retained to assist with the audit raised questions to Hiestand about the alleged "sale," Hiestand falsely stated that the sale occurred in December 2020.

6.      At the end of April 2021, Ignite filed its audited financial statements with the Ontario Securities Commission, accompanied by a certification by Dowdall. The financial statements included a false note that International Investments had "purchased" CAD $5,878,244 [about USD $4.6 million] of product "in December 2020" and, thus, overstated Ignite's revenue by that amount.

7.      The audited financial statements included an audit report signed by Accell, which

opined the financial statements "present fairly, in all material respects, the financial position of the company as at [sic] December 31, 2020." Because Hiestand knew or was at least reckless in not knowing that the International Investments transaction occurred in 2021, Accell's audit report was also false. Moreover, the audit report falsely stated that the audit had been conducted "in accordance with Canadian generally accepted auditing standards" when in fact, Accell and Hiestand had knowingly or recklessly failed to follow those standards.

## VIOLATIONS

8.    By the conduct alleged in this Complaint, Ignite violated Section 10(b) of the Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

9.    By the conduct alleged in this Complaint, Bilzerian violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a) and (c), and aided and abetted Ignite's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. Under Sections 20(a) and 20(b) of the Exchange Act, 15 U.S.C. §§ 78t(a), (b), Bilzerian is jointly and severally liable with and to the same extent as Ignite for Ignite's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, because he is Ignite's control person.

10.    By the conduct alleged in this Complaint, Dowdall violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

11.    By the conduct alleged in this Complaint, Rohleder violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a) and (c), and aided and abetted Ignite's violations of Section 10(b) of the Exchange Act,

15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, within the meaning of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

12.     By the conduct alleged in this Complaint, Schaefer violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

13.     By the conduct alleged in this Complaint, International Investments violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a) and (c), and aided and abetted Ignite's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, within the meaning of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

14.     By the conduct alleged in this Complaint, Accell violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. §§ 240.10b-5(b), and aided and abetted Ignite's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, within the meaning of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

15.     By the conduct alleged in this Complaint, Hiestand violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. §§ 240.10b-5(b), and aided and abetted Ignite's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, within the meaning of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

16.     Unless Defendants are restrained and enjoined, they will continue to engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

17.    The SEC brings this action under the authority conferred by Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

18.    The SEC seeks a final judgment: (i) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (ii) ordering Defendants to pay civil money penalties; (iii) prohibiting Bilzerian, Dowdall, Rohleder, and Schaefer from serving as an officer or director of any company that has a class of securities registered under Section 12 of the Exchange Act, 15 U.S.C. § 78*l*, or that is required to file reports under Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d); and (iv) ordering any other relief this Court may deem just and proper under Section 21(d)(5) of the Exchange Act, 15 U.S.C. § 78u(d)(5).

## JURISDICTION AND VENUE

19.    This Court has jurisdiction over this action under Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), 78aa.

20.    Defendants, directly or indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

21.    The conduct alleged in this Complaint that occurred in the United States constituted significant steps in furtherance of the violations alleged, including the creation and transmission of the fraudulent invoices, calls, and emails between Rohleder and Hiestand, and the creation of the false audit opinion.

22.    The conduct alleged in this Complaint that occurred outside the United States had a foreseeable substantial effect within the United States because many buyers, sellers, and

6

holders of Ignite's stock resided in the United States where Ignite stock was quoted and actively traded on OTC Link, an electronic inter-dealer quotation system that displays quotes from broker-dealers for many over-the-counter securities.

23.    Venue lies in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because Schaefer resides in this District in Yorktown Heights, New York.

## DEFENDANTS

24.    Ignite is a Canadian company headquartered in Ontario, Canada. Shares of Ignite were listed on the Canadian Securities Exchange under the ticker symbol BILZ from about October 2018 to August 2022, and the company was previously a reporting issuer in the provinces of British Columbia, Alberta, and Ontario. In May 2019, Ignite caused to be filed a Form 211 with the Financial Industry Regulatory Authority under Exchange Act Rule 15c2-11 to be quoted in the United States on OTC Link. Ignite's stock was then quoted on OTC Link under the ticker symbol BILZF from about July 2019 to August 31, 2022. In August 2022, Ignite announced that it had completed a going-private transaction.

25.    Bilzerian is a resident of St. Kitts and the father of Ignite's Chief Executive Officer. He holds himself out as a "consultant" with IIC Management Company, Ltd., an entity also based in St. Kitts which has provided capital funding to Ignite. On September 29, 1989, based on his role in several fraudulent stock purchasing schemes carried out in 1985 and 1986, Bilzerian was convicted of securities fraud and conspiracy to defraud the United States and was sentenced to four years in prison. *United States v. Bilzerian*, No. 1:88-cr-00962-RJW. The Second Circuit affirmed his conviction, *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991), and later denied postconviction relief, *Bilzerian v. United States*, 127 F.3d 237 (2d Cir. 1997). On April 8, 1991, the SEC obtained a judgment against Bilzerian in the District Court for the

District of Columbia based on the same conduct for civil violations of the federal securities laws, including Section 10(b) of the Exchange Act and Rule 10b-5. *SEC v. Bilzerian*, No. 89-1854 (SSH) 1991 WL 83964 (D.D.C. 1991). The district court permanently enjoined Bilzerian from further violations and later ordered him to disgorge $33,140,787.07 in illicit profit from his fraud, plus interest. *SEC v. Bilzerian*, 814 F. Supp. 116 (D.D.C. 1993), *aff'd*, 29 F.3d 689 (D.C. Cir. 1994). Thirty years of litigation to collect the disgorgement award followed. Bilzerian tried to discharge the debt in bankruptcy, but the Eleventh Circuit rejected that attempt. *In re Bilzerian*, 153 F.3d 1278 (11th Cir. 1998). In collection proceedings in district court, Bilzerian was found in contempt of the court's 1993 order, *SEC v. Bilzerian*, 112 F. Supp. 2d 12 (D.D.C. 2000), a receiver was appointed over Bilzerian's assets, 127 F. Supp. 2d 232 (D.D.C. 2000), and, after failing to provide requested documents to the receiver and filing another bankruptcy petition, Bilzerian was ordered incarcerated until he complied with the court's prior contempt order, 131 F. Supp. 2d 10 (D.D.C. 2001), *aff'd*, 75 Fed. Appx. 3 (Sept. 22, 2003). Litigation continues to the present, involving not only Bilzerian but also his wife and various individuals and entities that Bilzerian enmeshed in his attempts to shield his assets. *E.g.*, *SEC v. Loving Spirit Found., Inc.*, 392 F.3d 486 (D.C. Cir. 2004); *SEC v. Bilzerian*, 613 F. Supp. 2d 66 (D.D.C. 2009); *SEC v. Bilzerian*, 815 F. Supp. 324 (D.D.C. 2011), *aff'd*, 2012 WL 1922465, at *1 (D.C. Cir. 2012); *SEC v. Bilzerian*, 811 Fed. Appx. 3 (Jun. 24, 2020), *cert. denied* 141 S.Ct. 1528 (2021); *Steffen v. United States*, 995 F.3d 1377 (Fed. Cir. 2021); Order Granting Mot. Post-Judgment Intervention, ECF No. 1247, *SEC v. Bilzerian*, No. 1:89-cv-1854-RCL (June 18, 2024). At some point, Bilzerian moved to St. Kitts, and the disgorgement judgment entered against him remains unsatisfied.

      26.     Paul Dowdall is a resident of Ontario, Canada and a Chartered Professional

Accountant registered with the Chartered Professional Accountants of Ontario. Dowdall served as CFO of Ignite from June 2020 to September 2021. He is the CFO of a financial technology company listed on the Canadian Securities Exchange.

27.    Scott Rohleder is a resident of Morrisville, North Carolina. Rohleder has held himself out as the CFO of International Investments, the CFO of Ignite or its subsidiaries, and as a managing "Director" of Ignite. In his work on behalf of Ignite and International Investments, Rohleder generally works at Bilzerian's direction.

28.    John Schaefer is a resident of Yorktown Heights, New York. Schaefer was president and Chief Operating Officer ("COO") of Ignite from September 2020 to March 2022; he had been Ignite's COO starting in late 2019. He is currently COO of an indoor farming company based in Irvington, New York.

29.    International Investments is a St. Kitts company, headquartered in Basseterre, St. Kitts. Upon information and belief, Bilzerian controls International Investments.

30.    Accell Audit & Compliance, PA is a public accounting firm headquartered in Tampa, Florida, and incorporated under the laws of Florida. It has been registered with the Public Company Accounting Oversight Board ("PCAOB") since 2009.

31.    Christopher Hiestand is a resident of San Antonio, Florida. He is the founding partner and managing director of Accell, and a Certified Public Accountant licensed in the state of Florida since 2002.

## FACTS

### I.    Bilzerian controls Ignite.

32.    Ignite is a consumer packaged-goods company engaged in branding and distributing merchandise, including disposable vape pens and other nicotine e-liquid products.

Ignite was founded by Bilzerian's son and his son's business partner in 2017. Since Ignite's founding, Bilzerian's son has been its Chief Executive Officer ("CEO") and a member of its Board of Directors, while the other executive roles at the company have been filled by various individuals over time.

33.    Despite his son's nominal control of Ignite, Bilzerian has exercised control of Ignite's finances and operations since at least 2018.

34.    Examples of Bilzerian's control of Ignite include the following conduct:

a.    On or about October 4, 2018, Bilzerian emailed the CEO of Ignite's corporate predecessor stating, "If you can hire Eddie tomorrow as the Vice President of Finance, or any temporary title that is not an officer position which would delay our CSE approval, *effective October 1, 2018*, on the terms I sent you earlier I would be grateful. And if you will give Eddie authority to hire four non officers effective whatever dates they can start (Eddie or Scott [Rohleder] will give you those dates and the compensation terms), we will then have our initial team in place."

b.    On or about December 11, 2018, Bilzerian sent an email to Ignite's board members, stating, "I believe it is time to hold a Skype (Informal) Board Meeting. * * * * We should know everything about the capital raise, have a good handle on December, have time to prepare financial statements, create a budget for 2019, etc. * * * * Please let me know if you are unable to attend, otherwise I will assume you make it. Please make sure Scott [Rohleder] has your Skype address."

c.    On or about February 3, 2019, Bilzerian emailed Ignite's then-president,

stating, "you are not producing any earnings; you are not even close to producing any results that would indicate you can get to break even. You, Scott [Rohleder], and I need to meet on the 15th before the management meeting on the 16th to discuss this. In the meantime, please send me the detailed plan for spending on marketing in February."

  d.  On February 18, 2020, Bilzerian emailed Ignite's vice chairman of the board, stating, "I am terminating [Ignite's then-president] in the morning."

35.    In 2019 and through at least 2020, Bilzerian, through several entities he controls, including International Investments, provided Ignite capital to cover the company's operating shortfalls.

36.    By August 2020, Bilzerian was taking credit for Ignite's purported improved performance. For example, on or about August 25, 2020, he sent an email in which he stated, "It has been two weeks since we took over management of Ignite. We are making substantial progress but the level of incompetence and horrible judgments made by prior management are difficult to comprehend but, on a positive note, we are fixing them at an impressive rate."

37.    On or about August 31, 2020, Bilzerian emailed Ignite's board, stating that he "would like to have John Schaefer appointed President as he is already the Chief Operating Officer and make it clear we are not looking for anyone else. I would like to give John a salary increase to reflect his new title but we are working on what that should be. John works well with Scott [Rohleder] and me and we continue to make great progress cutting costs, positioning Ignite for success and a sale in 2022."

38.    About two-and-a-half hours later, Bilzerian again emailed the Ignite board: "John [Schaefer] will have his pay increased to $300,000 effective October 15, 2020, the same day that

the options will be reissued and his options will be increased to 1 million shares at that time, all subject to Board approval at the September board meeting. * * * * Why October 15th instead of now? We are laying off the entire Marketing Department this month and we are projected to be cash flow positive by the first week of October and we will be issuing the options on October 15th. I have spoken with John, and * * * he is in accord."

39.     Even with Schaefer nominally in charge of Ignite, Bilzerian still controlled Ignite's senior executives. For example, on or about October 7, 2020, Bilzerian emailed Dowdall, Ignite's then-CFO, telling him, "You should never unilaterally set a meeting with any director or directors without clearing that with John [Schaefer] and me (and preferably Scott [Rohleder])."

40.     Bilzerian's control extended to admonishing Ignite's board members. On or about November 25, 2020, Bilzerian emailed a board member following a conference call and called the board member's conduct on the call "frankly, embarrassing." Bilzerian questioned whether the board member had a "drinking problem" and advised, "If today was just a bad day you should apologize to everyone on the call and tell them it won't happen again." Bilzerian then bragged that "I cut expenses by $10 million a quarter and have increased sales to a level the company has never seen before and we will probably produce a net profit in the 4th quarter of $3 to $4 million."

**II.     Ignite sends fraudulent invoices to inflate its fourth quarter 2020 revenue.**

41.     Ignite began selling products to Company 1, a distributor of vaping and nicotine products based in Phoenix, Arizona, in September 2020.

42.     Company 1 became Ignite's third-party logistics ("3PL") provider, whereby Company 1 would store inventory owned by Ignite at Company 1's warehouse, and package and

ship that inventory on Ignite's behalf when Ignite made a sale.

43.    Company 1 thus acted in two roles in relation to Ignite: first, as Ignite's order fulfillment provider, and second, as an Ignite customer.

44.    Company 1 divided its warehouse space and stored Ignite-owned product on one side, and product purchased by Company 1 to sell to its own customers on the other. Company 1 and its employees sometimes referred to Ignite-owned product stored separately from the Company 1 side of the warehouse as being "in the 3PL."

45.    When Company 1 purchased product for its own use, it would submit a purchase order to Ignite, and Ignite would verify the purchase order and generate an invoice. Company 1 would then shift the product to the Company 1 side of the warehouse.

46.    Company 1 was only financially obligated for the product that it ordered from Ignite. The remaining Ignite-branded inventory in Company 1's warehouse was the property of Ignite.

47.    On or about November 30, 2020, five days after Bilzerian emailed that "we will probably produce a net profit in the 4th quarter of $3 to $4 million," Ignite sent Company 1 invoice number LAIN0000513 for $1,443,750.

48.    Invoice number LAIN0000513 was fraudulent in that Company 1 had not placed an order for the product listed in the invoice.

49.    Individual 1 had multiple calls with Schaefer between December 1, 2020, and December 14, 2020, in which he confirmed with Schaefer that Company 1 was not liable for invoice number LAIN0000513.

50.    On or about December 14, 2020, Ignite sent Company 1 invoice number LAIN0000760 for $770,275.00.

51.     Invoice number LAIN0000760 was fraudulent in that Company 1 had not placed an order for the product listed in the invoice.

52.     In an email exchange on December 14, 2020, discussing a spreadsheet for a meeting with Bilzerian the next day, Schaefer wrote to Individual 1, "Can you add a column that shows the amount of units you've been invoiced for by Ignite? I want to ensure he knows what we have billed you for as its larger than your sales show. Hope that makes sense. Or just do a total that we've billed you for under the total units of inventory so Paul can see that."

53.     Individual 1 responded to again confirm that Company 1 was not liable for the invoices: "Yes but I want to make sure we're on the same page, I have not accepted financial responsibility for these invoices as the inventory is in the 3PL."

54.     Schaefer responded, "Yes, thank you!"

55.     On or about December 28, 2020, Dowdall emailed Bilzerian and Schaefer "checking in to see where we stand with orders" and noting that Ignite was "going to try to move 500,000 units to [Company 2] . . . if [Company 1] didn't step up."

56.     Bilzerian replied, "We should have an update tomorrow."

57.     Individual 1 took an annual trip with his brother in late December through New Year's Day, and during those trips, he did not check his email account at Company 1.

58.     On or about December 29, 2020, Schaefer emailed Individual 2 and received an automated reply stating, "I'm currently out of the office and will return back 1/4/2021."

59.     On or about December 29, 2020, Schaefer emailed Bilzerian and Dowdall stating "[Company 1] has stepped up and will place an order for 500k units."

60.     On or about December 31, 2020, Ignite sent Company 1 invoice number LAIN0001060 for $2,875,000.00.

61.     Invoice number LAIN0001060 was fraudulent in that Company 1 had not placed an order for the product listed in the invoice.

62.     None of invoices LAIN0000513, LAIN0000760, or LAIN0001060 were connected to any purchase order submitted by Company 1 to Ignite in 2020.

63.     Individual 1 continued to dispute that Company 1 was liable for the invoices. In a text message to Schaefer on or about January 13, 2021, Individual 1 wrote, "The invoice from December was 3m, that is pretty large so want to confirm we aren't financially committed to that amount and have the physical inventory in 3pl and will submit [purchase orders] as we move it to manage actual financial liability . . . I want to be clear we can't take that much of a commitment right away [and] we will need to do it as it sells with the POs against the invoice . . . Same way we have been."

64.     Schaefer responded to Individual 1's text message, stating, "We can certainly talk about it with Paul on Tuesday."

65.     A few days later, on or about January 15, 2021, Bilzerian, in an email conversation that included Schaefer, wrote to Individual 1 that "of the $2.2 million that is due from [Company 1], you made a payment of $50,000."

66.     In a later email in the conversation on or about January 16, 2021, Individual 1 responded, "In regards to the $2.2 million we have not taken financial responsibility for these invoices, we were very clear from the start that [Company 1] was not interested in that kind of financial responsibility on any one item. Everything that we have financial responsibility for is tied back to a PO [purchase order] issued to Ignite . . . . Ignite has issued several invoices to us that we have no PO tied to, this inventory remains in the 3PL warehouse."

67.     Bilzerian responded a few minutes later: "Thank you for your email; it is helpful.

I wish to confirm that the only invoices from Ignite that [Company 1] acknowledges are the ones that are tied to a purchase order from [Company 1], correct? All the rest of the inventory belongs to Ignite, correct?"

68.     The next day, on January 17, 2021, Individual 1 confirmed that Bilzerian was correct about the invoices and inventory.

69.     On January 19, 2021, in follow up emails in the same conversation with Schaefer and Individual 1, Bilzerian "updated the balance according to [Individual 1's] accounting which is $315,845."

70.     In the same email conversation, Bilzerian also asked Individual 1 to confirm that Company 1 would place weekly orders and make weekly payments "for whatever you order that week" through May 2021, which would be drawn from the inventory listed in the December invoices.

71.     Bilzerian thus knew or was reckless in not knowing that Company 1 had not ordered the product listed in the fraudulent December 2020 invoices.

**III.     Ignite announces its fraudulent 2020 revenue.**

72.     Despite Individual 1's repeated refusals to accept liability for the three December invoices, Ignite issued a press release on January 19, 2021, announcing its unaudited fourth quarter 2020 revenue results.

73.     The release falsely stated that Ignite's revenue in the fourth quarter of 2020 "was [CAD] $10.1 million, which exceeded revenue for the previous three quarters combined." The release noted that revenue "grew steadily throughout the fourth quarter," and that Ignite's "December revenues were the highest monthly sales in the Company's history."

74.     The release quoted Schaefer stating, "The substantially improved fourth quarter

results reflect the successful efforts of the new management team to reduce costs and increase revenue."

75. Schaefer, Ignite's president and chief operating officer on January 19, 2021, was a maker of the false and misleading statements in the press release.

76. Schaefer knew or was reckless in not knowing that the press release was false and misleading.

77. As Ignite's president and chief operating officer, Schaefer's scienter is imputed to Ignite.

78. The fraudulent invoices to Company 1 comprised about 60 percent of the reported fourth quarter revenues.

79. The false and misleading statements in the January 19 press release were material.

80. Following the January 19 press release, Ignite's share price on OTC Link rose by more than 144 percent.

81. Average daily trading volume of Ignite stock in the United States between January 1 and January 19, 2021, was about 77,000 shares. On January 19, 2021, when Ignite issued its press release falsely reporting its 2020 financial results, more than 3.5 million shares of Ignite stock traded in the United States, and on January 20, 2021, more than 1.4 million shares traded in the United States.

**IV.** **In 2021, Ignite and International Investments enter a sham transaction to keep the fraudulent 2020 revenue in Ignite's audited financial statements.**

    **a. Company 1 refuses to confirm the fraudulent invoices.**

82. In January 2021, Accell began an audit of Ignite's 2020 financial statements.

83. As part of the audit, Accell sought to confirm Ignite's accounts receivable

reported in December 2020 and sent a series of "AR confirmation" letters to Ignite's customers based on data provided by Ignite to Accell, asking customers to verify amounts on invoices "due . . . December 31, 2020."

84.    On or about January 22, 2021, Accell emailed an AR confirmation letter to Individual 1, which listed eight outstanding invoices, three of which were the false invoices, LAIN0000513, LAIN0000760, and LAIN0001060, totaling about USD $5.1 million.

85.    The sum of the other five invoices, for product Company 1 had in fact ordered, came to just over USD $100,000.

86.    Individual 1 did not sign the AR confirmation letter.

87.    Instead, Individual 1 called Bilzerian and Schaefer and again disclaimed liability for the three invoices.

88.    On or about January 24, 2021, Individual 1 forwarded the AR confirmation letter to Bilzerian and Schaefer.

89.    On January 26 and 27, Bilzerian and Individual 1 exchanged revised versions of the AR confirmation letter, attempting to agree on wording in the letter so that Individual 1 would be comfortable signing the letter, but keeping the false invoices for purposes of confirming Ignite's inflated revenue for the audit.

90.    After Individual 1 sent his proposed changes to the AR confirmation letter to Bilzerian and Schaefer, Bilzerian told Individual 1 he would receive "an identical letter from Accell," and asked Individual 1 to sign and return that letter to Accell.

91.    On or about January 27, 2021, Accell sent Individual 1 a revised AR confirmation, which removed the reference to the invoices being "due . . . December 31, 2020," but retained the three fraudulent invoices.

92.     On or about January 28, 2021, Rohleder emailed Bilzerian to confirm that Accell had sent the revised AR confirmation letter to Company 1.

93.     Bilzerian emailed Individual 1, asking him to sign the letter and return it to Accell, and to "blind copy me on the email so I can put this matter to bed."

94.     Individual 1 remained apprehensive about signing the revised letter because it still listed the three false invoices.

95.     On or about January 28, 2021, Individual 1, with Company 1's attorney, had a phone call with Bilzerian.

96.     After unsuccessfully trying to persuade Individual 1 to sign the AR confirmation letter, Bilzerian became angry and stated that he would personally buy all the inventory listed on the fraudulent invoices instead.

97.     To salvage the relationship, Individual 1 reached out to Bilzerian by text immediately after the phone call ended.

98.     Bilzerian responded, "I have already advised Ignite [International Investments] is going to buy every single device you haven't paid for by close of business tomorrow. So make your payment tomorrow because after that you will be dealing with [International Investments]."

### b.  Ignite transfers the product ostensibly sold to Company 1 in 2020 to another distributor.

99.     The same week Individual 1 was negotiating the wording of the AR confirmation letter with Bilzerian, Company 2, an electronic cigarette distribution company in California, had placed its first order with Ignite.

100.    On or about January 29, 2021, Schaefer emailed Individual 2, the sales director for Company 2, to inform him that Ignite would be shipping "a large quantity of each

device/flavor" to Company 2's warehouse to "store and use for future orders." Schaefer added, "Obviously it will be Ignite product until you issue a [purchase order] and ship the product to your customer."

101.    In early February 2021, Ignite shipped the inventory listed in the fraudulent invoices for storage in Company 2's warehouse in North Hollywood, California, where it was segregated from the product already purchased by Company 2.

102.    For Company 2 to access the inventory Ignite had shipped, it would email Ignite an order and wait to receive an invoice before taking possession of the product.

103.    On or about February 19, 2021, Individual 2 emailed an Ignite employee, copying Schaefer, requesting an invoice for products taken from the inventory Ignite had shipped.

104.    On or about March 17, 2021, Schaefer responded to the February 19 email, "As discussed previously the inventory in your possession is through International Investments so payment will go to them not Ignite International, for this order and all future orders from the current 'non-paid for' inventory sitting at your location."

105.    Schaefer also attached an invoice issued by International Investments, with an address in St. Kitts. The invoice in turn called for payment to be made to a brokerage account held in the name of Rohleder, Inc., a Florida corporation controlled by Rohleder.

106.    Later invoices issued to Company 2 for products purchased out of the extra inventory were all issued either by International Investments or Rohleder, Inc.

107.    International Investments did not possess a tobacco license in California in 2021.

108.    Without a tobacco license, International Investments could not sell the disposable vape pens in Company 2's North Hollywood warehouse.

109.    Rohleder, Inc. did not possess a tobacco license in California until May 2021.

110.     Rohleder, Inc. obtained its license after it filed a Statement and Designation by Foreign Corporation with the California Secretary of State on April 13, 2021. In its Statement and Designation by Foreign Corporation, Rohleder, Inc. gave as the address of its principal office in California the same office address that Ignite's United States subsidiary used.

111.     Company 2 never entered a written agreement with International Investments or Rohleder, Inc., and dealt only with Ignite representatives when ordering from the inventory Ignite had sent to its warehouse.

112.     In fact, Schaefer specifically requested that Company 2 copy him on all orders of product from that inventory, and he personally sent the International Investments and Rohleder, Inc. invoices to Company 2 for payment.

113.     Schaefer was not an officer or employee of International Investments.

114.     In February and March 2021 communications with Company 2, both Schaefer and Bilzerian described the product Ignite had shipped to Company 2 as "essentially" "on consignment."

115.     In May 2021, after Company 2 had been selling Ignite's products for several months, Ignite began asking Company 2 to ship some of the extra inventory back to the Company 1 warehouse, as Ignite was running low on stock.

116.     Schaefer requested that Company 2 fill out paperwork to become an Ignite vendor, so that Ignite could "purchase" the product from Company 2, "as we cannot buy directly from International Investments."

117.     Ignite would send purchase orders to Company 2, who would obtain a Rohleder, Inc. invoice from Schaefer, and then in turn issue an invoice to Ignite for the same product. Ignite took back at least $300,000 of its own product from International Investments in this way.

     **c.   Bilzerian, Rohleder, Schaefer, and Dowdall concoct a way to keep the fraudulent revenue on the 2020 financial statements.**

118.    Meanwhile, from February through April 2021, Accell was continuing to audit Ignite's 2020 financial statements, which included the millions of dollars of fourth-quarter revenue that Company 1 would not confirm, and that resulted from inventory that Ignite had not actually sold in 2020.

119.    By February 5, 2021, Bilzerian, Rohleder, Schaefer, and Dowdall had arrived at a plan to keep the fraudulent revenue on Ignite's books for 2020.

120.    On or about February 5, 2021, Dowdall sent Bilzerian, Rohleder, and Schaefer an email setting out "the reconciliation for [Company 1] reflecting the process we discussed," and seeking agreement before Dowdall would "make the required changes in the books."

121.    In substance, the plan, as agreed by Bilzerian, Rohleder, Schaefer, and Dowdall, was to book the "sale" to International Investments in 2020 by issuing a back-dated, December 2020 "new invoice" for about USD $4.6 million, creating a receivable in that amount in 2020. In "settlement of [this receivable] in 2020," International Investments would apply this amount against convertible debt that Ignite purportedly owed International Investments.

122.    Dowdall understood that applying the receivable to debt incurred by Ignite to International Investments in 2021 would be inconsistent with a transaction that purportedly occurred in 2020. Thus, in his February 5, 2021 email to Bilzerian, Rohleder, and Schaefer, Dowdall advised 2021 debt to International Investments "should not be considered as I would prefer all components of this to settle in the same period."

**d.  Accell and Hiestand learn that Ignite has reduced accounts receivable from Company 1 by USD $4.6 million.**

123.    On or about February 4, 2021, the Accell employee responsible for collecting the AR confirmation letters emailed Hiestand, noting that it was time to send a second request for Company 1's confirmation and asking Hiestand to confirm that the proposed revision, which removed the "due . . . December 31, 2020," language, was acceptable. The Accell employee attached to his email both the original and the revised AR confirmation letters, which included the USD $4.6 million in fraudulent invoices.

124.    Hiestand responded to the employee's email, "The update is fine."

125.    Hiestand had also been copied on the original January 20, 2021 email to Ignite containing the nine AR confirmation letters Accell would send to Ignite's customers who were reflected on Ignites accounts receivable report as of December 31, 2020.

126.    By at least February 4, 2021, Hiestand knew or was reckless in not knowing that Company 1 accounted for more than $5 million of Ignite's reported revenue in the fourth quarter of 2020.

127.    On or about February 25, 2021, Ignite's vice president of finance sent two emails, both times copying Hiestand, acknowledging that Ignite needed to send a new version of Company 1's AR confirmation letter to Accell and that "[t]here was a revision made to this account."

128.    On or about February 28, 2021, Ignite sent Accell a third revised AR confirmation letter for Company 1, reflecting total balance as of December 31, 2020, of USD $563,983.55, a USD $4.6 million reduction.

129.    The revised third AR confirmation letter no longer listed the December 14 invoice

number LAIN0000760 for $770,275.00 or the December 31 invoice number LAIN0001060 for $2,875,000.00. The November 30 invoice number LAIN0000513, for $1,443,750, was largely offset with credits, including a credit for $983,264.12 dated December 31, 2020.

130.    Accell sent this third version of the AR confirmation letter to Company 1 on or about March 1, 2021, which Individual 1 signed and returned.

**e.  Ignite backdates invoices and credit notes.**

131.    As part of the audit process, Ignite provided Accell with copies of its invoices and credit notes, which reflect the following information:

| Date | Number | Type | Customer | Amount (USD) |
|------|--------|------|----------|--------------|
| 11/30/2020 | LAIN0000513 | Invoice | Company 1 | $1,443,750.00 |
| 12/14/2020 | LAIN0000760 | Invoice | Company 1 | $770,275.00 |
| 12/31/2020 | LAIN0001060 | Invoice | Company 1 | $2,875,000.00 |
| 12/31/2020 | LACN0000976 | Credit | Company 1 | ($770,275.00) |
| 12/31/2020 | LACN0000977 | Credit | Company 1 | ($2,875,000.00) |
| 12/31/2020 | LACN0000978 | Credit | Company 1 | ($983,264.12) |
| 12/31/2020 | LAIN0003322 | Invoice | International Investments | $770,275.00 |
| 12/31/2020 | LAIN0003323 | Invoice | International Investments | $2,875,000.00 |
| 12/31/2020 | LAIN0003324 | Invoice | International Investments | $983,264.12 |

132.    Ignite's invoicing software in early 2021 generated invoice numbers automatically in the order in which they were created.

133.    Invoice dates, in contrast, could be entered manually.

134.    Ignite issued invoice number LAIN0003321 on February 22, 2021, and invoice number LAIN0003325 on February 23, 2021.

135.    The invoices to International Investments numbered LAIN0003322, LAIN0003323, and LAIN0003324 were all backdated in that they were issued around

February 22-23, 2021.

136.    Ignite's invoicing software in early 2021 similarly generated credit note numbers automatically in the order in which they were created.

137.    Ignite issued credit note LAIN0000975 on February 19, 2021, and credit note LAIN0000979 on February 23, 2021.

138.    The credit notes to Company 1 numbered LAIN0000976, LAIN0000977, and LAIN0000978 were all backdated in that they were issued around February 19-23, 2021.

**f.    Accell and Hiestand help Ignite falsely report the International Investments transaction as 2020 revenue.**

139.    By early April, as Accell was completing the audit, it sought an explanation for the change to the Company 1 invoices and the purported "sale" to International Investments.

140.    On or about April 5, 2021, Dowdall emailed Bilzerian and Schaefer and proposed sending Accell the following response:

> [Company 1] acts as our warehousing and fulfillment provider in addition to being a customer. We initially planned to sell the devices directly to [International Investments] but were told at the time we needed licenses which we did not have in place to do this whereas [Company 1] did. Given this we originally put the sale through [Company 1]. Once we got clarity that [we] could in fact go directly to [International Investments] as there was no license issue we processed the return and re-invoiced [International Investments] directly. We did this mainly because we felt more comfortable having the funds come directly to us from [International Investments] as opposed to going through [Company 1].

141.    Dowdall knew, or was reckless in not knowing, this explanation was false in several respects. Among other things, Dowdall had asked about Company 1's—not International Investments'—orders from Ignite at the end of December 2020, and he had told Ignite's Board of Directors on or about January 28, 2021, that $5 million in revenue in December 2020 came from sales to Company 1.

142.    Dowdall also knew or was reckless in not knowing there were no "funds" coming from International Investments, but only debt forgiveness.

143.    Shortly after Dowdall circulated his proposed "explanation," he, Bilzerian, Schaefer, and Rohleder had a call later that day to discuss the matter.

144.    That same day, Rohleder emailed an Accell employee, asking for a call and stating, "As the CFO of International Investment[s], I am the person most familiar with the [Company 1] transaction, and I have been asked to lend my input."

145.    On or about April 6, 2021, Rohleder, Dowdall, Hiestand, and the Accell employee participated in a conference call to discuss the International Investments "sale."

146.    In a follow-up email to Hiestand, Dowdall, and the Accell employee, Rohleder reiterated the substance of the call earlier that day. Rohleder stated: "[W]hen hour [sic] relationship with [Company 1] changed, they were credited with the $4.6MM sale that was previously booked to them. . . . [International Investments] stepped into the shoes of [Company 1] and bought the inventory which it is now selling."

147.    Hiestand did not inquire with Company 1 to confirm the story Rohleder and Dowdall had told him about the International Investments "sale" or why Company 1 had refused to sign the original AR confirmation letters.

148.    Hiestand knew or was reckless in not knowing that the purported sale to International Investments was a material transaction because it represented about 35 percent of Ignite's total reported revenue in 2020.

149.    From the call and email from Rohleder (*see* ¶¶ 145-46), from the invoices and accounts receivable information received from Ignite in January and February (*see* ¶ 131), and from the repeated attempts during 2021 to obtain confirmation of the fraudulent invoices from

Company 1 and from Company 1's multiple refusals to confirm the fraudulent invoices (*see* ¶¶ 83-84, 91, 123-30), Hiestand knew or was reckless in not knowing that the purported sale to International Investments took place in 2021, not 2020.

150.    But on or about April 7, 2021, when Hiestand emailed the Canadian accountant Accell had retained to act as an Engagement Quality Control Reviewer ("EQCR") on the 2020 Ignite audit, Hiestand characterized the International Investments transaction as a "purchase [of] $4m of wholesale product from Ignite *in December*." (Emphasis added.) Hiestand noted that the "sale" would "probably end up representing about 35-40% of the total revenue for Ignite."

151.    The EQCR responded to Hiestand the same day questioning whether the International Investments transaction "is really a sale at Dec 31," and asking whether Ignite "shipped the product . . . or is it being held on consignment on behalf of [International Investments]."

152.    A few days later, on or about April 10, 2021, the EQCR noted in an email to Hiestand that the audit work papers reflected that Ignite had sold inventory to Company 1 and then reversed the sale and recorded the sale to International Investments. The EQCR wrote, "Given the start-up of the company and the increase in revenue 2018 to 2019 management no doubt doesn't want revenue growth to stall. This will be a significant area for the audit."

153.    The next day, on April 11, 2021, Hiestand responded that "this is the large sale in December" and that "in December" Company 1 "had a large quantity of product on-hand and wanted to return or reduce the original purchase price. [International Investments] stepped in and took ownership of the merchandise on the same terms . . . and has been distributing it."

154.    Hiestand did not tell the EQCR that more than half of the "large sale in December" was for product that Ignite had originally claimed to have sold to Company 1, in

invoice LAIN0001060, on December 31, 2020, the last day of the reporting period. Thus, Hiestand knew or was reckless in not knowing that Company 1 did not have this product "on-hand" and could not have "wanted to return" it in 2020.

155.    A few days later, when the Accell employee was reviewing Ignite's inventory at Company 1's warehouse, the employee asked about the credit notes reversing the fraudulent invoices. In an April 12, 2021 email, a Company 1 representative explained the product in the credit notes "never left 3PL inventory," indicating once again that Company 1 had not actually ordered the product.

156.    Accell and Hiestand did not tell the EQCR that Company 1 had never taken possession of the product Hiestand had falsely characterized as "on-hand" that Company 1 "wanted to return."

157.    For Accell to issue an unqualified audit opinion under Canadian auditing standards, the EQCR needed to sign off on the significant judgments made by Accell and the conclusions reached on its audit of Ignite's 2020 financial statements.

158.    The EQCR only signed off on significant conclusions, including those regarding the International Investments transaction in the 2020 financial statements, because of Hiestand's false representations that the transaction occurred in 2020.

159.    Hiestand also knew or was reckless in not knowing that the purported sale was not supported by any contemporaneous documentation from 2020.

160.    In fact, on or about April 11, 2021, Hiestand asked Rohleder to create a document for Hiestand to include in the audit file that would confirm the International Investments "purchase" and that the product could not be returned to Ignite.

161.    In an email that same day, Rohleder passed Hiestand's request on to Bilzerian,

copying Dowdall. Dowdall responded seeking confirmation from Bilzerian and Rohleder that providing such a confirmation was something International Investments would do.

162.    On or about April 13, 2021, Dowdall drafted a document titled "Acknowledgement of Payment Application," which stated that International Investments had purchased $4.6 million of inventory from Ignite in exchange for settling certain promissory notes and purported to be "effective December 31, 2020."

163.    Rohleder's only edit was to change the signatory for International Investments from himself to Individual 3, the nominal CEO of International Investments. This edit was made on the advice of Hiestand.

164.    Bilzerian approved the Payment Acknowledgement, sent it on to Individual 3, writing, "Please initial and sign and return to me and the others [Rohleder, Dowdall, and Schaefer] copied on this email."

165.    Individual 3 promptly signed and returned the Payment Acknowledgement as Bilzerian directed.

166.    At the same time Bilzerian and Rohleder were reviewing the Payment Acknowledgement, Dowdall had emailed Hiestand the unsigned draft with the note, "FYI, let me know your thoughts on this."

167.    Dowdall, Schaefer, and Individual 3 signed—but did not date—the Payment Acknowledgement, and Dowdall submitted the document to Hiestand to become part of Ignite's audit file.

168.    In fact, while the Payment Acknowledgement purported to reflect debt that International Investments had reduced or extinguished as of December 31, 2020, only a few weeks earlier, in late March 2021, Dowdall had sent to Bilzerian and Rohleder debt

confirmations, which Rohleder had signed, showing that same debt owing in full as of December 31, 2020.

169.    Bilzerian, Dowdall, and Rohleder each knew, or were each reckless in not knowing, that as of December 31, 2020, International Investments had not reduced any of the debt owed by Ignite in exchange for Ignite product.

**V.    Ignite issues fraudulent audited financial statements.**

170.    On April 30, 2021, Ignite issued its audited financial statements for the year ended December 31, 2020.

171.    The statements were filed with the Ontario Securities Commission.

172.    Ignite reported total sales revenue of almost CAD $17 million (USD $13 million) in 2020.

173.    A note to the financial statements titled "Related Party Transactions" falsely stated that International Investments "made purchases of product from Ignite of [CAD] $5,878,244 [about USD $4.6 million] in 2020."

174.    According to that same note, International Investments "was considered a related party by virtue of the appointment of [Individual 3] to its board of directors in July 2020."

175.    While two notes to the financial statements disclosed that debt owed to International Investments was reduced, nothing in the financial statements disclosed that the purported "purchases" by International Investments were paid for by that debt reduction, or that International Investments had provided financing for Ignite to buy the inventory which Ignite then "sold" to International Investments.

176.    With its financial statements, Ignite also filed a Certification of Annual Filings signed by Dowdall as Ignite's CFO, which certified that he had reviewed the annual filings, and

that "[b]ased on [his] knowledge" and "having exercised reasonable diligence," the filings contained no material misrepresentations or omissions, and fairly presented the financial performance of the issuer.

177.    The audited financial statements are false and materially misleading.

178.    Dowdall was a maker of the Certification of Annual Filings.

179.    International Investments did not "ma[k]e purchases of product from Ignite of [CAD] $5,878,244 [about USD $4.6 million] in 2020."

180.    Because the product was never sold to Company 1 in 2020 and International Investments did not buy the product in 2020, the audited financial statements overstate Ignite's 2020 revenue by CAD $5,878,244, or about 35 percent.

181.    The overstatement of annual revenue is material.

182.    The audited financial statements are also materially misleading because they imply that International Investments is a related party only because of Individual 3 when, in fact, Ignite and International Investments are related parties because of Bilzerian's control over both entities.

183.    Dowdall knew or was reckless is not knowing that International Investments did not buy CAD $5,878,244 of Ignite product in 2020.

184.    Dowdall knew or was reckless is not knowing that the audited financial statements overstated Ignite's revenue.

185.    Dowdall knew or was reckless in not knowing that Bilzerian controlled Ignite.

186.    Dowdall knew or was reckless in not knowing that Bilzerian controlled International Investments.

187.    As Ignite's CFO, Dowdall's scienter is imputed to Ignite.

**VI.    Accell issues a false audit report.**

188.    Ignite's 2020 financial statements also contain an "Independent Auditor's Report," signed by Accell.

189.    The audit report states: "In our opinion, these consolidated financial statements present fairly, in all material respects, the financial position of the company as at [sic] December 31, 2020." The report also stated that the audit had been conducted "in accordance with Canadian generally accepted auditing standards."

190.    Hiestand was a maker of the statements in the audit report.

191.    Because Hiestand knew or was reckless in not knowing that the International Investments transaction occurred in 2021 and that there was no basis for recognizing the revenue from that transaction in 2020, he did not actually hold the opinion that the financial statements fairly presented the financial position of Ignite as of December 31, 2020.

192.    The stated opinion that the financial statements fairly presented the financial position of Ignite as of December 31, 2020, was misleading in that the opinion lacked a factual basis in the financial statements because at least CAD $5,878,244 of reported 2020 revenue was fraudulent and based on transactions not entered until 2021.

193.    A reasonable investor would consider it important that an auditor did not actually hold the opinion that audited financial statements fairly presented the financial position of the audited company for the audit period.

194.    A reasonable investor would consider it important that an unqualified audit opinion for a company's financial statements lacked a factual basis for about 35 percent of the company's reported revenue during the reporting period.

195.    The sale to International Investments was a significant and unusual transaction,

purportedly occurring on the final day of the reporting period.

196. Hiestand explicitly identified the sale, along with management override and revenue recognition, as significant risks to its audit.

197. Even so, Hiestand failed to:

    a. question or corroborate management's representations about the transaction, including corroborating the existence of the original sales to Company 1;

    b. appropriately evaluate other contradictory evidence or investigate inconsistencies, such as the changing amounts in Company 1's AR confirmations, or the failure to move the product out of the Ignite-owned side of the warehouse until 2021;

    c. obtain adequate support for the unusual year-end journal entries reversing the sales to Company 1; or

    d. evaluate the lack of a business rationale for International Investment's purported purchase.

198. Hiestand knew or was reckless in not knowing that Accell had violated multiple provisions of Canadian Auditing Standards, including by failing to:

    a. obtain sufficient appropriate audit evidence related to, and design and implement appropriate responses to, identified risks of material misstatement due to fraud;

    b. evaluate unusual relationships for risk of fraud;

    c. investigate unusual entries made at the end of a reporting period;

    d. investigate the business rationale of unusual transactions, including those with related parties;

    e.   consider the relevance and reliability of all audit evidence, including evidence that contradicts or corroborates assertions made by management;

    f.   obtain further evidence if responses to confirmations are not reliable;

    g.   maintain professional skepticism throughout the audit; and

    h.   document how information identified that is inconsistent with the auditor's conclusion regarding a significant matter was addressed.

199.    The representation that the audit was conducted "in accordance with Canadian generally accepted auditing standards" was, therefore, false.

200.    A reasonable investor would consider it important to know that an auditor had issued an unqualified audit opinion without conducting the audit in accordance with recognized audit standards.

**FIRST CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(Ignite, Dowdall, Shaefer)**

201.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 200.

202.    Ignite, Dowdall, and Schaefer, by engaging in the acts and conduct described above, directly or indirectly, singly or in concert, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (i) employed one or more devices, schemes, or artifices to defraud; (ii) made one or more untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (iii) engaged in one or more acts, practices, or

courses of business which operated or would operate as a fraud or deceit upon other persons.

203. By engaging in the acts and conduct described above, Ignite, Dowdall, and Schaefer, and each of them, violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and 10b-5(c) Thereunder
### (Bilzerian, Rohleder, International Investments)

204. The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 200.

205. Bilzerian, Rohleder, and International Investments, by engaging in the acts and conduct described above, directly or indirectly, singly or in concert, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (i) employed one or more devices, schemes, or artifices to defraud; (ii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

206. By engaging in the conduct described above, Bilzerian, Rohleder, and International Investments, and each of them, violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(c).

## THIRD CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5(b) Thereunder
### (Accell, Hiestand)

207. The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 200.

208.    Accell and Hiestand, by engaging in the acts and conduct described above, directly or indirectly, singly or in concert, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, made one or more untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

209.    By engaging in the acts and conduct described above, Accell and Hiestand, and each of them, violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

### FOURTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(Bilzerian, Rohleder, International Investments, Accell, Hiestand)**

210.    The SEC re-alleges and incorporates by reference here the allegations in paragraphs 1 through 200.

211.    For the reasons set forth in paragraphs 1 through 203, Ignite, directly or indirectly, singly or in concert, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (i) employed one or more devices, schemes, or artifices to defraud; (ii) made one or more untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

212.    For the reasons set forth in paragraphs 1 through 203, Ignite violated Section

10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R.

§ 240.10b-5.

213.    By engaging in the acts and conduct described in paragraphs 1 through 206,

Bilzerian, Rohleder, International Investments, Accell, and Hiestand knowingly or recklessly

provided substantial assistance to Ignite with respect to its violations of Exchange Act Section

10(b), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

214.    Because of the foregoing, Bilzerian, Rohleder, International Investments, Accell,

and Hiestand are each liable under Exchange Act Section 20(e), 15 U.S.C. § 78t(e), for aiding

and abetting Ignite's violations of Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule

10b-5 thereunder, 17 C.F.R. § 240.10b-5, and, unless enjoined, Bilzerian, Rohleder, International

Investments, Accell, and Hiestand will each again aid and abet these violations.

### FIFTH CLAIM FOR RELIEF
### Control Person Liability Under Section 20(a) of the Exchange Act
### (Bilzerian)

215.    The SEC re-alleges and incorporates by reference here the allegations in

paragraphs 1 through 200.

216.    For the reasons set forth in paragraphs 1 through 203, Ignite, directly or indirectly,

singly or in concert, in connection with the purchase or sale of a security, by the use of means or

instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities

exchange: (i) employed one or more devices, schemes, or artifices to defraud; (ii) made one or

more untrue statements of a material fact or omitted to state a material fact necessary in order to

make the statements made, in the light of the circumstances under which they were made, not

misleading; or (iii) engaged in one or more acts, practices, or courses of business which operated

or would operate as a fraud or deceit upon other persons.

217.    For the reasons set forth in paragraphs 1 through 203, Ignite violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

218.    At all relevant times during the conduct alleged in this Complaint, Bilzerian participated in, and exercised control over, the operation of Ignite, and possessed the power and ability to control the acts constituting Ignite's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

219.    Bilzerian was a culpable participant in Ignite's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

220.    Because of the foregoing, Bilzerian, under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), is jointly and severally liable with, and to the same extent as Ignite for its violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Ignite, Dowdall, Schaefer, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

### II.

Permanently enjoining Bilzerian, Rohleder, International Investments, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with

them from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a) and (c), and from aiding and abetting any violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

## III.

Permanently enjoining Bilzerian and his agents, servants, employees, and attorneys, and those persons in active concert or participation with him from acting as a control person of a person who violates Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5 thereunder, 17 C.F.R. § 240.10b-5

## IV.

Permanently enjoining Accell and Hiestand, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with them from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. §§ 240.10b-5(b), and from aiding and abetting any violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

## V.

Ordering Defendants to pay civil penalties under Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3);

## VI.

Prohibiting, under Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), Bilzerian, Dowdall, Rohleder, and Schaefer from serving as an officer or director of any company that has a class of securities registered under Section 12 of the Exchange Act, 15 U.S.C. § 78*l*, or that is required to file reports under Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d); and

**VII.**

Ordering any other relief this Court may deem just and proper.

**JURY DEMAND**

The SEC demands a trial by jury on liability.

Respectfully submitted,

Dated: Los Angeles, California
      September 27, 2024

*/s/ Douglas M. Miller*

Charles E. Canter*
Douglas M. Miller
*Pro hac vice application forthcoming*

SECURITIES AND EXCHANGE
COMMISSION
Los Angeles Regional Office
444 South Flower Street, Ste. 900
Los Angeles, CA 90071
Telephone: (323) 965-3983 (Canter)
canterc@sec.gov

*Attorneys for Plaintiff*

Of Counsel
Patricia Pei

40